## Commonwealth v. Bates

*Alvin R. Isenberg*, for Commonwealth.

*Archie C. Voorhies* and *Warren R. Keck, Jr.*, for defendant.

ROWLEY, P. J., February 26, 1943.—Defendant was convicted in summary proceedings before a justice of the peace upon a charge of selling food, to wit, maple syrup, alleged to have been adulterated.

The prosecution is based upon the Act of June 1, 1937, P. L. 1127, 31 PS §1, which amended prior statutes. The information charges violation of subsection 6 of section 3 of that statute. The pertinent portions of the statute are:

Section 1. ". . . it shall be unlawful . . . to manufacture, sell . . . any article of food which is adulterated or misbranded within the meaning of this act."

Section 2. "(a) . . . for the purpose of this act, an article of food shall be deemed to be adulterated,—

"Sixth. If it consists of, or is manufactured in whole or in part from, a diseased, contaminated, filthy, or decomposed substance, either animal or vegetable; or an animal or vegetable substance produced, stored, transported . . . or kept in a way or manner that might tend to render the article diseased, contaminated, or unwholesome; or if it is any part of the product of a diseased animal, or the product of an animal that has died otherwise than by slaughter."

An agent for the Department of Agriculture purchased a gallon can of maple syrup from defendant on July 9, 1940, which he retained in his home until July 12th, when he drove to Erie, Pa., and delivered it to the department's chemist.

The certificate of the chemist's analysis recites, inter alia:

"Syrup is actively fermenting and undergoing decomposition. Found insect fragments and one whole insect in contents of can."

At the hearing, the agent for the department was asked:

"Q. At the time you bought this can of maple syrup was the can banged up the way it is now?

A. No, sir.

Q. Where was it banged up the way it is now?

A. In Mr. Krug's Laboratory—whatever happened to it."

The chemist testified:

"It was at one point of time pure maple syrup—I can tell you that.

"It was pure to start with."

He also stated that the syrup was actively fermenting at the time of the analysis; that it was undergoing decomposition.

He was specifically asked by the Commonwealth:

"Q. Mr. Krug, you found no evidence of any forbidden substance under the terms of the act?

A. No I did not. There were no poisons or no preservatives or anything of that nature present."

Upon cross-examination, the chemist testified:

"Q. You found no deleterious substance at all, outside of the flies?

A. No deleterious chemical substance, no. There was probably decomposition there that was deleterious.

Q. What would cause the decomposition?

A. Improperly kept or made. That might not have been boiled down far enough, or other syrup added to it with an odor. I don't know. That's up to the man who made it.

Q. You say it was not sealed when you obtained the can. Do you mean it wasn't capped or wasn't sealed fully?

A. There was no seal on there. In other words, Mr. Harshaw [the agent of the department] brought that in there without a proper seal."

The chemist testified further:

"A. The way it was brought in to me I just surmised that it was good maple syrup to start with, because it was a pure maple syrup, and it was just the manner in which it was kept or the manner in which the can was handled subsequent to its making that made the syrup spoil.

My analysis showed that it was a good syrup—pure maple syrup—but it was the way in which it was handled after the making.

Q. Are you able to express a professional opinion as to what accounts for the condition which you found? What do you attribute it to? Can you give an opinion?

A. All that I can say is that the syrup wasn't properly handled after it was made, and just exactly what would do it, or how it would be, there's quite a few things.

Q. Are you able to say what in your professional opinion caused the condition which you found?

A. You mean, definitely say so?

Q. Yes?

A. No, I didn't see the manufacture or how it was handled, or anything like that."

There is included in the transcript of testimony a letter from the director, Bureau of Foods and Chemistry of the Department of Agriculture, addressed to the district attorney. (It does not appear from the transcript by whom this exhibit was offered, nor why it was received in evidence.) The letter recites the Commonwealth's contention as follows:

"Among other things he [defendant] states there was no evidence [before the magistrate] that the syrup was manufactured of the forbidden substance named in the Act. *This contention is correct.* He also states there was no evidence that the syrup was kept in any way which might tend to render it diseased, contaminated or unwholesome. *This is also correct.* We did not base the prosecution, however, on either of these facts. The violation consisted of the presence of a house fly and a vinegar fly in the can, and also the decomposed condition of the syrup." (Italics supplied.)

Every good citizen will be sympathetic with the efforts of the legislature to prevent the sale of food that is unwholesome for human consumption. Nor is the power of the legislature limited to authority to prohibit the sale only of unwholesome food. For example, the sale of dairy products lacking a normal quantity

of butter fat may be prohibited, notwithstanding that the low content of butter fat does not render the product deleterious.

Some statutory prohibitions have been sustained which did not involve the element of unwholesomeness but were intended to prevent fraud and deception by the vendors: Simco Sales Service of Pennsylvania, Inc., v. Brackin et al., 344 Pa. 628.

The written charge is that defendant sold maple syrup that was adulterated "in that it consisted of and was manufactured . . . from a diseased, contaminated, filthy and decomposed substance animal and vegetable."

The chemist testified that his analysis disclosed no substance forbidden by the statute. He stated that the decomposition might be due to failure to boil down sufficiently, or to the addition of other syrup. These are the only matters suggested by the chemist as the probable causes of the decomposition. It must be obvious that neither the failure sufficiently to boil the sap nor the addition of other syrup would constitute the violation described above, in the absence of any evidence that the added syrup was contaminated.

In order to give meaning to the second clause in subdivision 6, it is necessary to repeat the introductory words of the first clause, viz, "If it consists of or is manufactured in whole or in part from . . ." Supplying then the necessary introductory words, the second clause declares that an article of food shall be deemed to be adulterated if it consists of, or is manufactured in whole or in part from, "an animal or vegetable substance produced, stored, transported, exposed, or kept in a way or manner that might tend to render the article diseased, contaminated, or unwholesome."

It seems entirely clear that the clauses quoted above pertain to the composition of the syrup. The prohibition is against its preparation or manufacture from either decomposed substances, or from substances that

have been exposed to contamination. Yet, the chemist testified:

"My analysis showed that it was good syrup—pure maple syrup but it was the way it was handled after the making.

"It was just the manner in which the can was handled subsequent to its making that made the syrup spoil."

In his letter—from which excerpts are quoted above—the Director of the Bureau of Foods concedes that the syrup was not manufactured from substances prohibited by the act, and that there is no evidence that the syrup was kept in any way which might tend to render it diseased, contaminated or unwholesome.

The director further states:

"The violation consisted of the presence of a house fly and a vinegar fly in the can, and also the decomposed condition of the syrup."

In our opinion the purpose of the act was to safeguard the preparation or manufacture of the food. This inference is somewhat supported by the fact that the statute provides against the prosecution of the retailer of adulterated food who can establish a guaranty by the manufacturer or wholesaler, or jobber or distributor, to the effect that the same is not adulterated. Further, the phraseology "consists of", "manufactured from", pertains to the preparation or manufacture of the food.

The term "consist", followed by "of", signifies "to be composed of", "to be made up of", "to have as parts or elements", "to be congruous with as an element or ingredient".

The written report of the chemist's analysis recites "found insect fragments and one whole insect in contents of can". It isn't clear whether the Commonwealth contends that the insects or flies caused the fermentation of the syrup, or whether the presence of a vinegar fly, for example, followed a fermentation due

to other causes. The chemist testified that decomposition was due to "the manner in which it was kept or the manner in which the can was handled subsequent to its making."

The director conceded that there was no evidence that the syrup "was manufactured of the forbidden substances named in the Act", and further that there was no evidence "that the syrup was kept in any way which might tend to render it diseased, contaminated or unwholesome", but the director states:

"The violation consisted of the presence of a house fly and a vinegar fly in the can, and also the decomposed condition of the syrup."

The fact that the syrup spoiled does not compel the deduction that it was composed of or manufactured from contaminated substances or exposed to contamination.

The testimony of the chemist that fermentation was due to "the manner in which it was kept or the manner in which the can was handled" gives us no specific information. Many housewives have had the disheartening experience of discovering that jars of fruit and vegetables, preserved under best sanitation, have "worked" and spoiled. Similarly, the grocer occasionally witnesses the explosion of a particular can of food while other cans of the same vintage are unaffected. Such incidents are not necessarily inconsistent with cleanly preparation or manufacture. The layman's impression is that maple sap insufficiently boiled is likely to produce maple syrup that sours readily, also that maple sap over-boiled readily converts to sugar and eventually sours.

In our opinion the Commonwealth has failed to establish that the maple syrup in question was composed of or manufactured from diseased, contaminated, filthy or decomposed substance, or a substance exposed to contamination. The Commonwealth was not obliged to detail the manufacture of the syrup, but it

was required to show a condition that was inconsistent with due observance of the prohibitions contained in the statute.

The last paragraph of section 6 of the statute discloses a purpose to penalize a retailer of adulterated food who exposes the "article" (of food) to contamination. This paragraph refers to subdivision 6, section 3, of the statute. It may be worth noting that the last paragraph of section 6 refers to the exposure, etc., of the "article" (of food), whereas subdivision 6, section 3, refers to exposure, etc., of the "substance" of which the article of food consists, or from which it is manufactured.

It may be that it was the purpose of subdivision 6, section 3, to penalize the sale of an unwholesome article of food, without regard to the causes of the unwholesome condition. If that were the intention, we are constrained to hold that such an intention is not clearly expressed.

The question before us is not whether a soured syrup containing flies is unfit for food. Instead, we are asked to decide under the facts in this case that the citizen has been guilty of the criminal conduct described in subdivision 6 of section 3 of the Act of June 1, 1937, P. L. 1127.

The citizen cannot be held to answer charges based upon penal statutes whose mandates are so uncertain that they will reasonably admit of different constructions. A criminal statute cannot rest upon an uncertain foundation. The crime, and the elements constituting it, must be so clearly expressed that the ordinary person can intelligently choose, in advance, what course it is lawful for him to pursue. Penal statutes prohibiting the doing of certain things, and providing a punishment for their violation, should not admit of such a double meaning that the citizen may act upon the one conception of its requirements and

the courts upon another: Connally, Commissioner, et al. v. General Construction Co., 269 U. S. 385, 393.

### Verdict

Our conclusion is that defendant is not guilty of the offense charged, and it is ordered that the County of Mercer pay the costs, except fees of Commonwealth witnesses.